# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 20- |
| v. | : | DATE FILED: _____ |
| JOEL STOHLMAN | : | VIOLATIONS: |
| | | 18 U.S.C. § 1343 (wire fraud – 1 count) |
| | : | 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. |
| | | § 240.10b-5 (securities fraud – 2 counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |

## INFORMATION

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

### BACKGROUND

At various times material to this information:

1.      AI Document Services, Inc. ("AIDC") was a Delaware corporation with its principal place of business in Atlanta, Georgia.  According to its public filings, for a brief period of time in 2014, the company was in the nutraceutical products business.  On August 31, 2015, the company merged with Diaspora Foods International, LLC and Asante Restaurant LLC. AIDC's securities were quoted on OTC Link (formerly referred to as the "Pink Sheets"), operated by OTC Markets Group, Inc. ("OTC Link"), under the symbol "AIDC."  AIDC was an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l.

2.      Creative Edge Nutrition, Inc. ("FITX") was a Nevada corporation headquartered in Beverly Hills, California.  According to its public filings, until November 30, 2015, it had a wholly owned subsidiary, Cen Biotech, Inc., which had been established in 2013

1

"for the sole purpose of applying to obtain a license to produce and supply medical marihuana" in Canada. After the spinoff of CEN Biotech, FITX was said to be "focused on developing innovative, high quality supplements," including an energy drink. FITX's securities were quoted on OTC Link under the symbol "FITX."

3. Interactive Health Network ("IGRW") was a Nevada corporation headquartered in Reno, Nevada. According to public filings and press releases, the company "manufactures, markets and sells high quality lifestyle products and nutraceuticals" and had a wholly owned subsidiary Cannabis Health Group. In May 2015, the company announced three new divisions in the cannabis industry. IGRW's securities were quoted on OTC Link under the symbol "IGRW."

4. The companies traded on OTC Link tended to be extremely small, and the stock in those companies tended to be closely held (that is, owned by a small number of individuals) and thinly traded (that is, traded far less frequently than stocks in larger companies on larger exchanges).

5. Defendant JOEL STOHLMAN was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

6. Person Number 1 ("Person No. 1"), known to the United States Attorney, was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

7. Person Number 2 ("Person No. 2"), known to the United States Attorney, was a resident of Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

8. Person Number 3 ("Person No. 3"), known to the United States Attorney, was a businessman based in Georgia who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

9. Person Number 4 ("Person No. 4"), known to the United States Attorney, was an attorney in New York who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

10. Person Number 5 ("Person No. 5"), known to the United States Attorney, was an accountant who owned and controlled a substantial number of shares of AIDC, FITX, and IGRW stock.

11. An individual known to the United States Attorney and identified here as the cooperating witness (the "CW") was secretly cooperating with the government. In this capacity, the CW posed as an individual who could facilitate the manipulation of the price and trading volume of publicly traded shares for a fee.

12. Undercover Agent-1 ("UC-1") was a Special Agent with the Federal Bureau of Investigation (the "FBI"). In this capacity, UC-1 posed as a family friend of the CW and also as the girlfriend of Undercover Agent-2.

13. Undercover Agent-2 ("UC-2") was a Special Agent with the FBI who posed as a stock promoter, and also as the boyfriend of UC-1. In this capacity, UC-2 posed as an individual who could facilitate the manipulation of the price and trading volume of publicly traded shares for a fee.

14. The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States government which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of

publicly traded securities, including securities such as AIDC, FITX, and IGRW stock that were traded on OTC Link. Federal securities laws prohibited fraud in connection with the purchase and sale of securities, including the manipulation of the price and trading volume of stock sales through (i) the hidden coordination of company press releases with the distribution of misleading email newsletters and (ii) the use of secret payments to brokers.

15. From in or about Spring 2014 through in or about Spring 2016, in the Eastern District of Pennsylvania, and elsewhere, defendant

### JOEL STOHLMAN

devised and intended to devise a scheme to defraud shareholders of public companies AIDC, FITX, and IGRW, and to obtain money and property by means of knowingly false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

16. Defendant JOEL STOHLMAN and his co-schemers, including Person No. 1, Person No. 2, Person No. 3, Person No. 4, Person No. 5, and other persons known to the United States Attorney, sought to generate illegal proceeds by causing manipulative market activity in AIDC, FITX, and IGRW stock that was designed to falsely make it appear that trading in those stocks was the result of free and fair market forces, and by preventing the SEC from detecting the scheme or taking regulatory action against them to halt the scheme. They did this in various ways, including the following:

    a. Obtaining control of virtually all of the free trading shares in AIDC, and the majority of the free trading shares that were not subject to additional restrictions in FITX and IGRW, so that they could control the timing, price, and volume of shares available

4

for trading. By having control of this stock, scheme participants made it more likely that they would receive maximum profit because most of the stock available for sale during the manipulation would be stock that was under the participants' control. Having control of this stock would also make it less likely that the stock manipulation would draw the attention of the SEC, as the participants could control the promotion of the stock over a longer period of time, thereby avoiding a suspicious rapid rise and fall of the price and trading volume of the stock.

        b.     Disguising their ownership of the shares, as well as the proceeds that they planned to receive in the scheme, by (i) using nominees and nominee corporations, (ii) establishing International Business Companies ("IBC") with nominee owners and officers, and (iii) planning to use foreign financial accounts, to make it more difficult for the SEC to detect the scheme and/or trace the proceeds received by the schemers. This activity also made it less likely that the SEC would learn that individual participants in the scheme owned more than 5% of the stock. Under SEC rules, when a shareholder or a group of shareholders had beneficial ownership of more than 5% of stock in a company, the shareholder or group was required to file a Schedule 13D or a Schedule 13G reporting various facts about the ownership.

        c.     Establishing a company, FDQ, Inc., and employing a nominee officer for FDQ in order to pool shares of their stock. By pooling their shares, the schemers could control the amount of shares that were for sale in the market at any one time and prevent their fellow schemers from selling too rapidly, as sales of a large amount of stock in a short period of time could cause the price of the stock to fall quickly.

        d.     Agreeing to transfer the schemers' shares to FDQ gradually to conceal that FDQ, and the schemers' group collectively, had beneficial ownership of more than 5% of a public company's stock.

e.      Establishing a brokerage account for FDQ at a brokerage firm based in the United States and agreeing that the schemers would also have their own brokerage accounts at this brokerage firm.  The schemers chose this brokerage house knowing that two employees of the brokerage firm had agreed to violate SEC rules by selling the shares in the manipulated stocks and then allocating the proceeds equally among the scheme participants, rather than treating FDQ and the schemers as separate market participants whose shares should be handled independently.

f.      Having company officers in place at AIDC, FITX, and IGRW who would act at the direction of the scheme participants rather than exercising their independent judgment.

g.      Agreeing to provide shareholder lists and other documents that were not available to the general public, as well as the passwords to their brokerage accounts, to UC-2 in order to be "transparent," thereby avoiding the risk that a scheme participant could cheat other participants by not adhering to the agreed upon schedules for promoting the sale of stock.

h.      Using debt conversion in order to obtain free trading shares of AIDC, FITX, and IGRW so that the stock could be sold during the scheme.  Debt conversion was obtained by providing false and misleading opinion letters to stock transfer agents and brokers.

i.      Agreeing to pay a kickback fee of 40% of the proceeds of their stock sales for prearranged purchases of the schemers' stock in AIDC, FITX, and IGRW.  The schemers understood that 30% of these proceeds would be paid to corrupt stockbrokers who would purchase this stock in the discretionary accounts of their customers and that 10% of these proceeds would be UC-2's fees for arranging these fraudulent purchases.  The schemers also

understood that the brokers would hold the stock in their clients' accounts for a lengthy period of time after purchasing the stock, generally at inflated prices. Having brokers who were willing to buy stock at agreed upon times and, when possible, at agreed upon prices, and who were also willing to hold this stock was valuable to the schemers because it guaranteed them stock sale proceeds in illiquid securities, increased the likelihood that their stock manipulation would be profitable, and decreased the likelihood that there would be a sudden drop in the price of the stocks that would generate an investigation by the SEC.

        j.    Agreeing to coordinate the manipulative trading activity described above with issuance of company press releases to provide a false pretext for the increased trading volume and increased price of the stocks that they would be manipulating.

        k.    Agreeing to hire a stock promoter to distribute numerous email newsletters (i.e., "email blasts") to potential stock purchasers in coordination with the issuance of press releases before the corrupt brokers caused their discretionary clients to buy the stock. The coordination of press releases and email blasts served multiple purposes, including: (i) creating the false impression to investors that there was market interest in AIDC, FITX, and IGRW stock, when in fact there was little or no interest in these stocks; (ii) increasing the share price of AIDC, FITX, and IGRW stock before the corrupt brokers bought the stock so that the price would be higher when they did so; and (iii) limiting scrutiny by the SEC by making it appear that increases in the volume of trading of these stocks was justified by the press and investor interest that the company generated. The planned press releases and email blasts would be misleading because they would not disclose various material facts, including the fact that (i) defendant STOHLMAN and his co-schemers controlled the vast majority of AIDC, FITX, and IGRW stock available for trading, (ii) defendant STOHLMAN and his co-schemers were coordinating these public

companies' press releases with email blasts and/or prearranged stock transactions, or (iii) defendant STOHLMAN and his co-schemers were paying kickbacks to brokers to purchase their stock in their customers' discretionary accounts.

l.      Agreeing to take additional steps to avoid SEC scrutiny, including the following: (i) having the proceeds of stock sales paid to nominees in order to disguise the ownership of the shares; (2) limiting what they discussed via email, and also being discreet when speaking on recorded telephone lines with stock brokers, in order to avoid creating a record of their manipulative activity; and (3) creating false contracts and invoices to disguise payments made to participants in the scheme and individuals assisting them in order to create the false appearance that those payments were for legitimate services to AIDC, FITX, IGRW, and other unrelated companies, when in reality the payments were for assistance in manipulation of the stock or as a means of distributing proceeds of the scheme to participants.

m.      Using the wires and facilities of interstate and foreign commerce to carry out their scheme.

17.      In or about Spring and Summer 2014, defendant JOEL STOHLMAN, the CW, and other co-schemers took preliminary steps in the future manipulation of the stocks of AIDC, FITX, and IGRW.   The CW had participated in prior manipulations of FITX and IGRW with defendant STOHLMAN and various associates, including Person No. 1, Person No. 2, and Person No. 4, during which the participants had used convertible debt to obtain free trading shares, set up offshore brokerage accounts, caused email blasts to be widely distributed to potential investors in coordination with press releases, and sold their stock at a profit.  The CW and defendant STOHLMAN also discussed the manipulation of AIDC, a new company in which

the CW had invested $9,000 in exchange for 6 million shares of stock, despite not knowing what company would be merged into AIDC.

18.    On or about July 11, 2014, during recorded telephone calls, defendant JOEL STOHLMAN told the CW that he should speak with Bahamian Attorney A, who would assist the CW in establishing offshore entities and brokerage accounts so the CW could deposit his shares of AIDC for the planned promotion.  According to defendant STOHLMAN, establishing each entity would cost $2,500, and the CW would need multiple accounts to avoid the "4.9% rule," referencing the SEC rule that required individuals or entities that owned more than 5% of the stock of a public company registered under Section 12(g) of the Exchange Act to file a form (Schedule 13D or Schedule 13G) reporting their ownership of this stock.  At the end of this telephone call on July 11, 2014, defendant STOHLMAN stated that he would be meeting with Person No. 5, and they would need the names of the CW's offshore entities.

19.    On or about July 16, 2014, defendant JOEL STOHLMAN emailed the CW, Person No. 1, Person No. 2, Person No. 3, Person No. 4, Person No. 5, and another individual, instructing them to open a brokerage account at Interactive Brokers LLC.

20.    From in or about July 2014 through in or about October 2014, defendant JOEL STOHLMAN and Person No. 1 helped the CW to set up offshore entities to hold the AIDC stock that the CW would sell during the planned manipulation of AIDC.  Defendant STOHLMAN instructed the CW to put one of these entities in the name of a nominee to conceal that the CW controlled both accounts and owned more than 4.9% of AIDC's stock.  In response to this instruction, the CW told defendant STOHLMAN that one of the CW's spouse's friends, referencing UC-1, would sign the documents for his two offshore entities, Cap One LLC and Cap Two LLC.

21.     In order to further prepare for the manipulation of AIDC stock, defendant JOEL STOHLMAN sent an email to Person No. 1, Person No. 2, Person No. 3, and another individual on or about September 10, 2014, asking them to send their AIDC stock certificates to Person No. 4, who would hold the stock until AIDC's regulatory filings were complete and the certificates could be transferred.  Defendant STOHLMAN also directed the email recipients to be prepared to open an account at Folio Investments when defendant STOHLMAN instructed them to do so.

22.     In or about October 2014, UC-1, who was acting as a friend of the CW's spouse, had multiple recorded conversations with defendant JOEL STOHLMAN, who was assisting her in setting up brokerage accounts as the CW's nominee.  During one of those calls, after UC-1 told defendant STOHLMAN that UC-1's boyfriend (referring to UC-2) was a stock promoter, defendant STOHLMAN invited UC-1 to bring him to Atlanta for the opening of Person No. 1's restaurant, as several of defendant STOHLMAN's close associates would be attending.  On a recorded call on or about October 31, 2014, UC-1 accepted defendant STOHLMAN's invitation.

23.     On or about November 7, 2014, UC-1 and UC-2, who was acting as UC-1's boyfriend, met defendant JOEL STOHLMAN at an event at a restaurant in Atlanta, Georgia. During the recorded meeting, Person No. 1, who was one of the owners of the restaurant, was present.  Defendant STOHLMAN told UC-2 that defendant STOHLMAN worked with a group of seven individuals on stock deals.  During the meeting, UC-2 also met an individual who had experience with Bahamian businesses (the "Bahamas Nominee"), whom defendant STOHLMAN confirmed was the "nominee" for the Bahamian entities that were being used by the CW.  During the event, Person No. 2 told UC-2 that Person No. 1, Person No. 2, defendant STOHLMAN, and

10

the Bahamas Nominee had been together for a long time and shared a high level of trust.

24. On or about November 8, 2014, in a private room at the same Atlanta restaurant, UC-2 met with defendant JOEL STOHLMAN, Person No. 1, and Person No. 2. During this meeting, defendant STOHLMAN discussed AIDC, stating that: (i) there were seven individuals on their side of the deal, including himself, Person No. 1, Person No. 2, and Person No. 3; (ii) the seven people in their group worked with Person No. 4 and Person No. 5; (iii) there were 86 million outstanding shares of AIDC, with 44 million shares in the float (i.e., the free trading shares); (iv) collectively, his group, together with Person No. 4 and Person No. 5, controlled the entire float; and (v) any deposited free trading shares were held in an account that had less than 5% of the free trading shares. At the time of this meeting, a new private company had not been merged into AIDC.

25. As the meeting continued, defendant JOEL STOHLMAN and Person No. 2 discussed Creative Edge Nutrition, ticker FITX, mentioning the CEO and that the product that would be the focus of the company was an energy drink. Defendant STOHLMAN then stated that IGRW's float was 1.3 billion shares, the group owned almost all of them, and the same people involved in AIDC were involved in IGRW.

26. During the meeting, UC-2 explained that he could help the group get liquidity in the stock, that is, increase the volume of shares traded so that they could sell their shares. Person No. 2 discussed obtaining stock from debt conversion, a process whereby persons who own debt in a company can exchange that debt for free trading shares under certain circumstances. Person No. 2 said that (i) they were an "open book," and they would provide UC-2 with passwords for all of their brokerage accounts; (ii) their group could get as many shares as they wanted; and (iii) they knew brokers who could bring in market makers.

27.     As the meeting continued, UC-2 asked what the group was looking to get out of FITX.  Person No. 2 explained that they wanted to generate $3 million to $5 million, adding that maybe the stock would increase to $.05 to $.07 per share, after which point the stock price would drop.  Person No. 2 said that the group wanted to work with the stock over one to two years because, according to Person No. 2, shareholders would not get hurt, the stock would sustain itself, and the group would make their money.  According to Person No. 2, he did not want to upset the shareholders and bring attention to the project, and agreed with UC-2 that he did not want the attention of the SEC.

28.     UC-2 explained his services, stating that he had brokers who would buy a large quantity of stock on behalf of their clients, and agree to hold the stock for a long period of time.  UC-2 said that he wanted DTCs, as he needed to keep track of the stock that was trading.  DTCs are shareholder lists maintained by the Depository Trust Company that are not available to the public.  These lists contain the names of the brokerage firms that are holding company stock on behalf of the firms' customers (the actual owners of the stock) and the number of shares each broker holds.

29.     Person No. 2 responded that they could get DTCs to UC-2 six days per week because the DTCs were critical to understanding how the stock was trading and who owned the company's stock.  In addition, Person No. 2 instructed defendant JOEL STOHLMAN to give UC-2 the passwords for the DTCs so that he could access them himself.

30.     As the meeting continued, defendant JOEL STOHLMAN, Person No. 2, and UC-2 discussed brokers.  Person No. 2 said that it was not advisable to put all of the group's shares in one brokerage firm.  He also mentioned that there could be problems with brokerage firms in the Bahamas.  Person No. 1 then said that he agreed that Bahamian accounts could have

problems unless one knew the right people, but said that they did know people in the Bahamas who could be helpful.

31.     Discussion at the meeting returned to IGRW.  Defendant JOEL STOHLMAN and Person No. 1 said that they had debt that could be converted at a discount. Person No. 2 added that the hardest part of the deal was investor relations, they were looking to partner with someone like the CW, and they hoped that they could have a similar relationship with UC-2 to the one they had with the CW.

32.     Defendant JOEL STOHLMAN told UC-2 that they could buy debt in IGRW and get an opinion letter from someone whom he confirmed was a "friendly attorney." Such opinion letters are needed by transfer agents to deem shares available to trading, i.e., free trading.  STOHLMAN said that his group wanted to liquidate $10 million worth of IGRW shares.

33.     Toward the end of the meeting, in response to UC-2's question regarding whether it was okay to talk on the phone with people in the group, Person No. 2 explained that it was okay to talk about actual business operations on the phone, but it was not okay to discuss the logistics of deals.  As the meeting was ending, Person No. 1 said that they would work out the structure and execution of the deals.

34.     After the November 2014 meetings in Atlanta through 2015, defendant JOEL STOHLMAN and his co-schemers continued to plan the manipulation of AIDC, FITX, and IGRW with UC-2.   In late 2015, they agreed upon a new aspect of the scheme that would enable them to "prime the pump" and, thereby, generate more proceeds from the planned sales through UC-2's corrupt brokers.

35.     Specifically, on a recorded call in or about November 2015, defendant

JOEL STOHLMAN expressed his concern that IGRW's stock price was down to $.0005, and that he did not know about stocks and how to get the price to go up. UC-2 said that they should "prime the pump" and offered to introduce defendant STOHLMAN to a stock promoter who did email blasts. Defendant STOHLMAN agreed with UC-2's statement that they wanted to get the company money and help it grow, but the group also wanted to make money. Defendant STOHLMAN said that he wanted to sell IGRW at $.002 a share, for a total of $1.6 million, or at $.004 a share, and AIDC for approximately $1.00 a share. Defendant STOHLMAN also agreed that he wanted to do email blasts. In response to a question from defendant STOHLMAN regarding how the customers of the brokers dealing with UC-2 would get out of the stock that the brokers purchased for them, UC-2 responded that the brokers would not sell the stock because if they did, the price would go down and UC-2 would not pay them.

36.    During late 2015 and early 2016, defendant JOEL STOHLMAN and his co-schemers continued to plan their manipulation of AIDC, FITX, and IGRW stock, and UC-2 participated in some of their communications. For example, defendant JOEL STOHLMAN and Person No. 1 participated in a lengthy recorded call with UC-2 on or about January 14, 2016. During this call, UC-2 told defendant STOHLMAN and Person No. 1 that he was in Philadelphia, Pennsylvania, and would be meeting with the brokers that they would be paying to buy AIDC, FITX, and IGRW stock into their customers' accounts. During the call, defendant STOHLMAN stated that they did not want to hurt shareholders of these companies, but they also wanted to get out of their stock. He added that they were willing to work with UC-2 in any way he wanted.

37.    During this call, the participants reviewed the facts of the three planned manipulations.

14

        a.     Regarding AIDC, defendant JOEL STOHLMAN explained that (i) there was a total of 42 million free trading shares, (ii) he and Person No. 1 each owned 4 million shares, (iii) Person No. 4 and Person No. 5 each owned 6.5 million shares, (iv) another stock promoter owned 1 million shares, and (v) FDQ, the entity that the schemers had set up to pool shares and control selling, had 2.5 million shares.  Defendant STOHLMAN stated that everyone else's shares were waiting to be transferred to the FDQ account, but only 4 million shares could be deposited into the FDQ account at any one time to stay below the 5% ownership threshold.  Defendant STOHLMAN clarified that overall, 18 million of the 42 million total AIDC shares would be transferred and then sold from the FDQ account.

        b.     Regarding FITX, defendant STOHLMAN stated that FITX's float (i.e., the number of free trading shares) was huge and its share price was low—$.003.  Defendant STOHLMAN said that he and Person No. 1 owned 250 million FITX shares combined, and Person No. 4 and Person No. 5 each owned 25 million.

        c.     Regarding IGRW, defendant STOHLMAN said that he and Person No. 1 each owned 250 million shares, Person No. 2 and Person No. 3 each owned 150 million shares, and the CEO of IGRW had an additional 30 to 35 million shares that he would want to sell.

        d.     With respect to both FITX and IGRW, defendant STOHLMAN explained that even though their float was large, most of the shares over which the schemers had no control could not be sold because many of the individuals holding those stock certificates were Canadian, and Canadian residents could not deposit their stock certificates into U.S. brokerage firms.

        38.     During this January 14, 2016 call, defendant JOEL STOHLMAN, Person

15

No. 1, and UC-2 also discussed the share price at which the schemers wanted to sell these shares:

        a.      Regarding AIDC, defendant STOHLMAN stated that due to the need to pay UC-2's 40% fee, they wanted to sell all of their AIDC shares for $.60 to $.80 per share. Following this, defendant STOHLMAN laughed and said that "obviously [Person No. 5], [Person No. 1], myself, and [Person No. 4] would like to get out of ours first, at the highest [price]." Person No. 1 added that the schemers were seeking $3 million to $5 million for the restaurant, and that defendant STOHLMAN, Person No. 1, Person No. 4, and Person No. 5 would all be happy with $2 million to $3 million each.

        b.      Regarding FITX, defendant STOHLMAN said that they were looking to sell these shares for at least $.01 per share, but opined that he thought that FITX's share price could rise to $.05 to $.10.

        c.      Regarding IGRW, defendant STOHLMAN expressed hope that its share price would increase to $.005 as a result of the manipulation, and Person No. 1 suggested that IGRW's share price could rise to $.005 to $.01.

        39.      As this lengthy conversation on January 14, 2016, concluded, UC-2 told defendant JOEL STOHLMAN and Person No. 1 that he would discuss the three tickers with the brokers with whom he was working. Defendant STOHLMAN informed UC-2 that they had two additional deals coming in the near future. When the UC-2 stated that he needed to know who would be conducting the prearranged trades for each company, defendant STOHLMAN responded that everyone would be handling their own accounts, and FDQ's CEO would trade for FDQ. After UC-2 stated that it was necessary to coordinate to ensure that the correct stock was being purchased in the prearranged transactions, defendant STOHLMAN responded that after selling the stock in question, their brokers would allocate the sales (and their proceeds) among

the schemers equally. The conversation ended with a discussion of possibly doing a test trade the following week to ensure that the mechanics of the kickback worked properly before they proceeded in much larger amounts.

40.     On or about February 4, 2016, defendant JOEL STOHLMAN and Person No. 4 spoke separately with the UC-2 several times by telephone in order to plan the prearranged test trades in AIDC and FITX stock that they executed later that day. The plan was to have the schemers offer a prearranged amount of AIDC and FITX shares at a prearranged price and time, and to have UC-2's brokers purchase these shares at the prearranged price and time.

41.     On or about February 4, 2016, as the schemers had directed and agreed, the schemers sold (i) approximately 30,050 shares of AIDC stock for approximately $.098 per share, for a total of approximately $2,945, and (ii) approximately 1,155,000 shares of FITX stock for approximately $.0038 per share, for a total of approximately $4,389. In reality, and unbeknownst to the defendants, the FBI purchased many of these shares with its undercover funds. The co-schemers agreed to pay UC-2 and his brokers 40% of this total amount for buying these AIDC and FITX shares in prearranged stock transactions.

42.     On or about February 5, 2016, to pay the kickback fee for the test purchase in FITX stock, defendant JOEL STOHLMAN and his co-schemers caused approximately $2,000 to be wired from one of Person No. 4's bank accounts to a BB&T account in UC-1's name in Philadelphia, Pennsylvania. Defendant STOHLMAN and his co-schemers understood that these funds were the bribe payment to UC-2 and his brokers for making the prearranged purchase of FITX stock on or about February 4, 2016.

43.     On or about February 16, 2016, to pay the kickback fee for the test purchase in AIDC stock, defendant JOEL STOHLMAN and his co-schemers caused

17

approximately $1,089.50 to be wired from FDQ's Wells Fargo bank account to a BB&T account in UC-1's name in Philadelphia, Pennsylvania. Defendant STOHLMAN and his co-schemers understood that these funds were the bribe payment to UC-2 and his brokers for making the prearranged purchase of AIDC stock on or about February 4, 2016.

44.     On or about February 17, 2016, defendant JOEL STOHLMAN sent an email to Person No. 3 with the subject line "fyi whats owed." The email attached a chart reflecting three sets of FITX's purported liabilities: accrued interest, accrued consulting, and various other debts. This chart, circulated the day before the schemers began the manipulation in earnest, showed, among others things, that according to FITX's books and records, (i) defendant STOHLMAN, Person No. 1, Person No. 2, the CW, and Person No. 3, were owed accrued interest; and (ii) defendant STOHLMAN, Person No. 1, Person No. 2, and Person No. 3's entity, were owed accrued consulting fees. Significantly, these debts could be converted into shares through debt conversion. Upon receiving this information, Person No. 3 responded later the same day: "wow . . . cool . . . . . "

45.     On or about February 18, 2016, Person No. 5 sent an email addressed to two employees of a brokerage firm, which who would be selling the schemers' shares during the manipulations. Person No. 5 blind copied Person No. 4. Person No. 5 informed the brokerage firm employees that there was "likely to be activity in FITX and AIDC very soon." He instructed them to sell as many of his FITX and AIDC shares as possible and advised them to "[b]e fair" to the "other shareholders with large holdings of these shares who ha[d] accounts with" the brokerage firm. Person No. 5 was referring to the arrangement that the schemers had previously discussed over the telephone with one of the brokerage firm employees by which the

broker would sell as many shares of the manipulated securities as he could and then allocate the proceeds equally among the scheme participants.

46.     Later on or about February 18, 2016, Person No. 4 participated in a recorded call with UC-2 to discuss their plans to start the manipulation of AIDC and FITX. During this telephone call, Person No. 4 conferenced in the broker who would be selling the schemers' shares during the manipulation.  Person No. 4 informed the broker that AIDC and FITX would both be putting out a lot of press, which would lead to a lot of trading activity. Person No. 4 added that he and Person No. 5 would be calling the broker and asking him to sell at certain prices.  The broker replied that he had already spoken about this with Person No. 5, who had sent an email (referring to Person No. 4's email from earlier in the day).  The broker added that he had told Person No. 5 to stop sending emails.  Person No. 4 then commented that he was annoyed with the explicit nature of Person No. 5's email (upon which he had been blind-copied), and that there was no reason to send this email.

47.     Immediately after this conference call with the stockbroker, Person No. 4 and UC-2 spoke again on a recorded telephone call.  When UC-2 asked what Person No. 5 had said in the email to the broker, Person No. 4 responded that he had "almost puked" when he heard it.  Person No. 4 explained that the email said that a bunch of them were selling stock, the broker should make sure to sell it proportionately from each account, and the broker should not sell to anyone else who is a stranger.  UC-2 agreed that one would not want this information recorded in an email.

48.     On or about February 18, 2016, at the direction of defendant JOEL STOHLMAN and his co-schemers, a press release for AIDC entitled "Asante International Dining Corp. (AIDC) Announces Celebrity Chef as CEO" was issued.

49.     On or about February 18, 2016, at the direction of defendant JOEL STOHLMAN and his co-schemers, a press release for FITX entitled "GIDDY UP Energy Products Launch Update" was issued.

50.     Later on or about February 18, 2016, in conjunction with the issuance of these press releases, defendant JOEL STOHLMAN and his co-schemers, working with UC-2, caused misleading email blasts touting AIDC, FITX, and IGRW to be widely disseminated to potential investors.  The schemers promoted IGRW despite the fact that the company's regulatory problems had not yet been resolved because the schemers planned to solve them soon and manipulate IGRW in the near future.

51.     In the weeks and months following the SEC's suspension of trading in AIDC, FITX, and IGRW on February 19, 2016, the schemers took efforts to continue the scheme.

52.     On or about January 14, 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOEL STOHLMAN,**

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described herein, that is, defendant STOHLMAN and Person No. 1, while they were not in Pennsylvania, participated in a telephone call with UC-2 (who was in Philadelphia, Pennsylvania) during which they planned the scheme described above.

All in violation of Title 18, United States Code, Section 1343.

## COUNTS TWO AND THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 14 and 16 through 51 of Count One of this Information are re-alleged and incorporated by reference as though fully set forth herein.

2.      From at least in or about Spring 2014 through at least in or about Spring 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOEL STOHLMAN

did unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by:  (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the securities described below, each class of securities constituting a separate count:

| COUNT | DESCRIPTION |
| --- | --- |
| TWO | common stock of AIDC |
| THREE | common stock of FITX |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

_Ronald Sarach for_

**WILLIAM M. McSWAIN**
**UNITED STATES ATTORNEY**

*Criminal No.*

## UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

vs.

JOEL STOHLMAN

INFORMATION

Counts

18 U.S.C. § 1343 (wire fraud – 1 count)
15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (securities fraud – 2 counts)
18 U.S.C. § 2 (aiding and abetting)

A true bill.

_____
Foreman

Filed in open court this _____ day,
Of _____ A.D. 20 _____

_____
Clerk

Bail, $ _____